# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **GAYANE LALABEKYAN,** *individually and on behalf of the putative class, 44 Grigor Lusavorich Street, Stepanakert, Republic of Artsakh (Nagorno-Karabakh)* | |
| Plaintiff, | |
| | No. 1:23-cv-1994 |
| v. | |
| **MOHAMMAD REZA VAZIRI** *(6833 Capri Place, Bethesda, Maryland 20817)* | |
| Defendant. | |

## CLASS ACTION COMPLAINT

NOW COMES Plaintiff GAYANE LALABEKYAN, individually and on behalf of the putative class, and files this CLASS COMPLAINT against Defendant MOHAMMAD REZA VAZIRI and, in support thereof, states as follows:

### NATURE OF THE CASE

1.      This case involves the role of DEFENDANT VAZIRI in aiding and abetting the false imprisonment and torture of 120,000 Armenians, including 30,000 children, in Artsakh (also known as Nagorno-Karabakh), a self-governing enclave in the South Caucasus. On December 12, 2022, the government of Azerbaijan orchestrated a blockade of the only road connecting the 120,000 ethnic Armenians in Nagorno-Karabakh with the outside world, thereby preventing

anyone and anything from entering or exiting. The blockade has caused a humanitarian catastrophe in Nagorno-Karabakh, depriving the Armenian population of access to food, medicine, heat, electricity, and normal living conditions.

2.      The United States, the United Nations, the European Parliament and numerous other states and global institutions have called upon Azerbaijan to end its blockade of Nagorno-Karabakh. Numerous international human rights organizations—including Human Rights Watch, the Lemkin Institute for Genocide Prevention, the International Association of Genocide Scholars, and Amnesty International—have warned that Azerbaijan is committing ethnic cleansing in Nagorno-Karabakh and that the risk of genocide against the Armenians of Nagorno-Karabakh is acute. The International Court of Justice has ordered Azerbaijan to lift the blockade.

3.      DEFENDANT VAZIRI is the president and CEO of Anglo Asian Mining PLC and the controlling principal of RV Investment Group Services, LLC. DEFENDANT VAZIRI seeks, through companies he directs and controls, access to precious metal deposits existing in Artsakh (Nagorno-Karabakh). He has a direct relationship with the hereditary president of Azerbaijan, Ilham Aliyev, and had a direct relationship with his father, Heydar Aliyev, the prior president of Azerbaijan. DEFENDANT VAZIRI claims Heydar Aliyev promised him the right to exploit the mineral deposits in Nagorno-Karabakh. In pursuit of his access to these precious metal deposits, DEFENDANT VAZIRI has directly collaborated and consorted with President Ilham Aliyev and his government officials, demanding access to and control over the precious metal deposits in Nagorno-Karabakh.

4.      DEFENDANT VAZIRI has aided and abetted Azerbaijan in blockading Nagorno-Karabakh, encouraging and assisting Azerbaijan with knowledge and/or reckless disregard that Azerbaijan seeks to subject the Armenians to starvation, illness and desperation until the Artsakh

(Nagorno-Karabakh) government succumbs and *inter alia* allows DEFENDANT VAZIRI and/or his agents or collaborators access to the precious metal mines in Nagorno-Karabakh. DEFENDANT VAZIRI's conduct was and continues to fuel the ongoing blockade, and his demands for access to the Nagorno-Karabakh mines is a core catalyst in the ongoing blockade. Azerbaijan's blockade itself is a violation of international law, and DEFENDANT VAZIRI has aided and abetted Azerbaijan's violation of international law knowingly and/or with reckless disregard.

5.      Plaintiff is a victim of the blockade. She has been falsely imprisoned by the blockade since December 12, 2022, enduring grave violations of her freedom of movement and right to life; suffering lack of access to food, proper medical care and medicine; enduring physical pain and suffering in extreme winter temperatures without regular access to heat or electricity; and suffering other human rights abuses.  She represents a putative class of nearly 120,000 Artsakh Armenians that continue to suffer under Azerbaijan's strategic blockade of Nagorno-Karabakh, aided and abetted by DEFENDANT VAZIRI.

6.      In this case, Plaintiff and the putative class bring three causes of action against DEFENDANT VAZIRI: (1) aiding and abetting false imprisonment; (2) aiding and abetting intentional infliction of emotional distress; and (3) aiding and abetting violations of the Torture Victims Protections Act.

**PARTIES**

7.      Plaintiff GAYANE LALABEKYAN is a civilian living in Artsakh (Nagorno-Karabakh) who has lived in Artsakh since the start of Azerbaijan's blockade. Plaintiff is not a citizen or resident of the United States.

8.      Defendant MOHAMMAD REZA VAZIRI is a civilian living at 6833 Capri Place, Bethesda, Maryland 20817. He is the controlling person of RV Investment Group Services, LLC, a Delaware limited liability company with registered offices at 251 Little Falls Drive, Wilmington, Delaware 19808; President and CEO of Anglo Asian Mining PLC, a UK entity with a registered office at 33 St. James's Square, London, UK SW1Y 4JS; and the lifetime chairman of the United States – Azerbaijan Chamber of Commerce with registered offices at 1212 Potomac St. NW, Washington, DC 20007.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the action arises under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73. The Court has supplemental jurisdiction over the common law aiding and abetting false imprisonment claim and the intentional infliction of emotional distress claim under 28 U.S. Code § 1367.

10.     Venue is proper in the United States District Court for the District of Columbia for this action pursuant to 28 U.S.C. § 1391(b) because, among other things, DEFENDANT VAZIRI continuously and regularly conducts business and business-related activity in the District of Columbia including, without limitation, through offices located at 1212 Potomac Street NW Washington DC 2007, Washington, D.C.

## STATEMENT OF FACTS

### Background

11.     The Nagorno-Karabakh Republic, also known as Republic of Artsakh, is a self-governing republic in the mountains of the South Caucasus, located between the Republic of Azerbaijan and the Republic of Armenia. Artsakh today is populated by 120,000 Armenians. Armenians have lived in Artsakh for millennia: the land itself is landscaped with over 4,000

Armenian churches, Armenian artifacts and Armenian symbols dating back into the 4th Century and further.

12.    Artsakh has survived as a self-governing Armenian entity for centuries—at times under Armenian ruling dynasties, at times as part of Greater Armenia, sometimes falling under Persian or Russian imperialism, and as an independent entity. While the Artsakh Armenians endured numerous invasions and conquests over the centuries, they have remained on their native lands as a self-governing people. Artsakh self-governs today as a democratic republic with universal suffrage and functioning, representative and democratic institutions. Its capital is the city of Stepanakert, which is home to more than half of today's 120,000 Artsakh Armenians.

**Nagorno-Karabakh During Soviet Occupation**

13.    Nagorno-Karabakh, like the rest of the South Caucasus, came under Russian Bolshevik occupation in 1921.  On July 5, 1921, as a means by which to divide and conquer the region, Soviet leader Joseph Stalin administratively removed Nagorno-Karabakh (populated by Christian Armenians) from Armenian control and placed it under the administrative control of the newly created Azerbaijan Soviet Socialist Republic (populated largely by Muslim Tatars). In 1923, Nagorno-Karabakh became an autonomous oblast called the Nagorno Karabakh Autonomous Oblast ("NKAO").

14.    Importantly, the Azerbaijan Soviet Socialist Republic ("Azerbaijani SSR"), like all Soviet Union republics, was *not* a sovereign entity at international law at this time or at any other time during the life of the Soviet Union. In fact, the union republics—as well as "autonomous oblasts", like the NKAO—were constitutionally *sub-sovereign* entities existing under the recognized sovereign at international law, the Union of Soviet Socialist Republics ("Soviet Union").

15.     Throughout the Soviet period, and perhaps as Stalin had envisioned, the newly created Azerbaijani SSR sought to exert increasing levels of dominance and control over the NKAO and its Armenians. This was alarming, as just prior to the Soviet period, the Muslim Tatars (today called Azerbaijanis) had partnered with Ottoman Turkish forces to execute the eastern flank of the Armenian Genocide.

16.     The anti-Armenian sentiment among the Azerbaijanis was not dismantled by Soviet authorities in the Azerbaijani SSR. In fact, acts of discrimination against Armenians, as well as violence against and subjugation of Armenians by the authorities of the Azerbaijani SSR, was common. Institutionalized anti-Armenian policies were particularly intense in the NKAO where the Azerbaijani SSR used its administrative oversight to suppress Armenian identity and culture and even to alter the demography of the NKAO.

### Calls for Reunification with Armenia and the Pogroms

17.     In the late 1980s, rumblings of political, economic, and ethnic dissent began to emerge across the Soviet Union. Mikhail Gorbachev's policies of *glasnost* and *perestroika* had awakened democratic and free market sentiments throughout the country.

18.     The South Caucasus was not immune to the promises of these changes, and the Armenians of Nagorno-Karabakh saw an opportunity to undo Stalin's act of placing the NKAO under the administrative control of Azerbaijan SSR and to implement *glasnost* to seek reunification with the Armenian SSR.

19.     On August 13-14, 1987, approximately 75,000 Armenians from Nagorno Karabakh and Soviet Armenia signed a petition addressed to Gorbachev requesting the reunification of Nagorno-Karabakh with Armenia. Reunification demands and demonstrations continued throughout 1987 and into 1988. On February 20, 1988, the NKAO Soviet Council of Deputies

passed a resolution and petitioned Moscow to transfer the NKAO from the administrative control of the Azerbaijani SSR to that of the Armenian SSR.

20.    The Azerbaijani SSR's response was heavy-handed. It launched attacks and pogroms against the Armenians living in Sumgait, the second largest city of Azerbaijan, located 19 miles northwest of Baku. Mobs took to the streets, pulling Armenians from their homes, beating, raping, and killing them. The Sumgait pogroms lasted three days and were widely reported in the U.S. media.

21.    The Sumgait pogroms would be the *first* in a new series of anti-Armenian pogroms in Azerbaijan. In the months that followed, massacres against Armenians ripped through the Azerbaijani SSR, during which Azerbaijanis sought to eliminate Armenians, killing and/or ethnically cleansing them from the cities of Sumgait, Baku, Kirovabad and many other cities in Azerbaijan. By the end of 1990, more than 300 Armenians were reportedly killed, thousands were injured and tortured, and almost 500,000 Armenians had been deported or displaced from their homes in the Azerbaijani SSR.

22.    Amidst these pogroms and massacres against Armenians, other tensions were also increasing across the USSR. Throughout 1989, it became increasingly apparent that Gorbachev's experiment with *glasnost* and *perestroika* would not be enough to hold the Soviet Union together, and the prospect of breakaway regions became increasingly likely.

**Soviet Dissolution and Independence**

23.    To manage the possible disassociation of regions from the whole, while hoping to salvage the union itself, the Soviet Union passed a law on secession from the USSR on April 3, 1990 ("Secession Law").

24.     Article 3 of the Secession Law provided that, upon the decision of any union republic (such as the Azerbaijani SSR or Armenian SSR) to secede from the Soviet Union, "the people of autonomous republics and autonomous formations retain the right to decide independently the question of remaining within the USSR or within the seceding Union republic, and also to raise the question of their own state-legal status." The Secession Law further provided that the question as to state status would be raised by referendum.

25.     On August 30, 1991, the Supreme Council of the Azerbaijani SSR adopted a declaration "On the restoration of state independence of the Azerbaijan Republic," seeking to re-establish the first Azerbaijani republic which had existed nearly a century prior, for merely two years from May 1918 to April 1920. Incidentally, this first Azerbaijan republic never included Nagorno-Karabakh; in other words, Nagorno-Karabakh was not part of the Azerbaijani republic that the Supreme Council of the Azerbaijani SSR sought to resurrect by its 1991 declaration.

26.     Moreover, this declaration by the Azerbaijani SSR triggered Article 3 of the Secession Law, allowing the people of NKAO—the "autonomous oblast"—to choose, by referendum, whether Nagorno-Karabakh would (a) stay in the Soviet Union, (b) secede with and be part of an independent Azerbaijan, or (c) raise its own legal state status. The NKAO opted for the third option: to raise its own legal state status.

27.     On September 2, 1991, the NKAO declared its independence from the Soviet Union—the existing sovereign state at the time under international law. Pursuant to Article 3, the NKAO scheduled the required referendum. Referendum ballots were sent to all parts of Nagorno-Karabakh, with the question: "Do you agree that the proclaimed Nagorno Karabakh Republic be a sovereign state, to independently determine the forms of cooperation with other states and communities?"

28.     The referendum vote was conducted on December 10, 1991. Voter turnout was overwhelming: over 82% of the NKAO population went to the polls to vote. A near unanimity of those votes—over 98%—voted in favor of Nagorno-Karabakh becoming a sovereign state.

29.     The Nagorno-Karabakh (Artsakh) Republic was legally established as a sovereign state by democratic referendum, pursuant to the legally mandated procedures of the Soviet Secession Law, on December 10, 1991.

**The First Karabakh War and the Ceasefire**

30.     War ensued between Azerbaijan and Nagorno-Karabakh, the latter supported by Armenia, and continued for nearly three years. On May 5, 1994, in Bishkek, Kyrgyzstan, a provisional ceasefire agreement was signed by the representatives of the parliaments of each of the three parties to the conflict: the Republic of Azerbaijan, the Republic of Nagorno-Karabakh, and the Republic of Armenia. It was followed by the signing of a ceasefire agreement on May 12, 1994, signed by the defense ministers of the three parties to the conflict.

31.     The line of contact established by the ceasefire held relatively firm for more than 25 years.

32.     During that time, the Artsakh Republic governed itself as a constitutional, democratic republic with a legislature, independent judiciary, and democratically elected executive. In fact, during this period, the people of the Artsakh Republic elected four presidents, voted in 6 general elections, chose 7 national assemblies, and enjoyed a political landscape that included several political parties.

33.     Azerbaijan, on the other hand, fell into abject authoritarianism. Heydar Aliyev, who had already ruled during the time of the Azerbaijani SSR for some 20 years, came to rule as "president" of the independent Republic of Azerbaijan for 10 years.

34.     In 2003, after Heydar Aliyev's death, his son Ilham became the "president" of Azerbaijan. Ilham has ruled the country since, earning the country recognition as an oppressive authoritarian regime and a rating of "Not Free" in multiple third-party indices. The Aliyev family continues to rule Azerbaijan today.

**Defendant Vaziri's Business Dealings with Azerbaijan**

35.     At the time of the signing of the 1994 ceasefire, DEFENDANT VAZIRI enjoyed a personal relationship with Heydar Aliyev. Like the Aliyevs, DEFENDANT VAZIRI was interested in the exploitation of precious metal deposits for personal profit. DEFENDANT VAZIRI was particularly interested in precious metal deposits in and around Nagorno-Karabakh, which was rich in copper, gold, and molybdenum.

36.     In 1997, Azergyzil, an Azerbaijan state entity, and RV Investment Group Services, LLC, a Delaware limited liability company owned and controlled by DEFENDANT VAZIRI, entered into an agreement ("Production Sharing Agreement") for the exploration, development, and production sharing of certain mining areas—including the Drmbon (Kyzlbulag) mine located wholly in Nagorno-Karabakh and the Sotk (Soutely) mine located partially in the Republic of Armenia.

37.     Heydar Aliyev announced the partnership between Azergyzil and RV Investment Group Services, LLC on August 20, 1997, personally thanking DEFENDANT VAZIRI, who was in attendance in Azerbaijan for the presidential announcement. Heydar Aliyev also recognized the role of the long-time governor of New Hampshire and former White House Chief of Staff, John H. Sununu, in securing the partnership deal. John H. Sununu had, and continues to have, an equity stake in one or more of DEFENDANT VAZIRI's companies.

38.    DEFENDANT VAZIRI then undertook several corporate transactions and combinations—transactions involving RV Investment Group Services, LLC and certain Cayman Islands and British Virgin Islands companies—which ultimately resulted in Anglo Asian Mining PLC ("Anglo Asian") and its subsidiaries obtaining the purported rights granted under the Production Sharing Agreement.

39.    DEFENDANT VAZIRI became the President and CEO of Anglo Asian and, throughout the mergers and acquisitions, DEFENDANT VAZIRI ensured that he remained the control person as to the purported rights granted under the Production Sharing Agreement.

40.    With the mergers completed, DEFENDANT VAZIRI's interest in obtaining access to the natural resources located in Nagorno-Karabakh became increasingly acute. DEFENDANT VAZIRI even solicited international institutions to attempt to disrupt the use of the Nagorno-Karabakh natural resources by the Artsakh Armenians.

41.    DEFENDANT VAZIRI and Ilham Aliyev's cooperation in the mining of precious metals continued through the opening of a factory in Gadabay, Azerbaijan on or about September 10, 2013. In fact, four years earlier, DEFENDANT VAZIRI and John H. Sununu had both joined Ilham Aliyev at the groundbreaking ceremony for the Gadabay factory, where DEFENDANT VAZIRI and John H. Sununu even made public addresses.

42.    In 2014, DEFENDANT VAZIRI's Anglo Asian received a $3 million credit line from Pasha Bank, a Baku-based bank owned by Ilham Aliyev's daughters and their maternal grandfather.

**Azerbaijan Launches War Against Artsakh—*Twice***

43.    In January 2016, Anglo Asian learned of substantial deposits of copper and molybdenum in the Kashen (Demirli) mine, located in Nagorno-Karabakh.

44.     John Sununu, then serving on the board of directors of Anglo Asian, met directly with Ilham Aliyev in Washington, D.C. on March 31, 2016. During the meeting, and upon information and belief, Mr. Sununu and Ilham Aliyev discussed precious metal deposits in Nagorno-Karabakh, including the Kashen (Demirli) mine located in the northern Martakert region of Nagorno-Karabakh.

45.     The next day, on April 1, 2016, Azerbaijan launched a full-scale military offensive toward the Martakert region of Nagorno-Karabakh in the direction of the Kashen (Demirli) mine. A four-day war ensued. While the Azerbaijani attack was repelled by Nagorno-Karabakh defense forces, over 100 Artsakh Armenians were killed in the Azerbaijani attacks, including civilians.

46.     On September 27, 2020, the Republic of Azerbaijan waged another unprovoked large-scale attack on Nagorno Karabakh. During the 44 days of war that followed, Azerbaijan forcibly displaced nearly 40,000 ethnic Armenians from the territories it conquered—nearly one third of the entire Nagorno-Karabakh population. Not a single displaced Armenian has been able to return.

**Trilateral Statement and the Lachin Corridor**

47.     On November 9, 2020, a trilateral statement signed by Armenia, Azerbaijan, and the Russian Federation sought to end active hostilities ("Trilateral Statement").

48.     Upon its signing, the Russian Federation sent peacekeepers to the region in order, in the words of the decree authorizing the deployment, to "prevent the mass death of the civilian population of Nagorno-Karabakh".

49.     Paragraph 3 of the Trilateral Statement provides for the deployment of the Russian peacekeepers "along the line of contact in Nagorno Karabakh and along the Lachin corridor".

50.     Paragraph 6 of the Trilateral Statement, in turn, provides in pertinent part:

The Lachin corridor (5 km wide) which will ensure the communication between Nagorno Karabakh and the Armenia and at the same time will circumvent the city of Shushi, shall remain under the control of the peacekeeping contingent of the Russian Federation.

. . .

The Republic of Azerbaijan shall guarantee safe movement of citizens, vehicles and cargo in both directions along the Lachin corridor.

51.    After Azerbaijan's aggression in late 2020, the Lachin Corridor remains the only strip of land connecting the 120,000 ethnic Armenians in Nagorno-Karabakh with Armenia, and thus with the outside world. Just a single road traverses this mountainous corridor: the Goris-Stepanakert Highway. Since the 2020 war ended, all ethnic Armenians in Nagorno-Karabakh requiring medical treatment in the outside world must take this road. Likewise, all food, medical and medicine supplies, and other humanitarian assistance destined for the Armenians in Nagorno-Karabakh can only be delivered on this one road.

52.    Despite the Trilateral Statement, Azerbaijan has continued its efforts to extinguish, expel and terrorize Artsakh Armenians. Azerbaijan has done so by, among other things: threatening, attacking, infiltrating, and occupying Armenian villages in violation of the ceasefire agreement; forcibly displacing village residents, including all ethnic Armenians from the villages of Hin Tagher, Khtsaberd, Parukh, Berdzor, Aghavno, and Nergin Sus; killing and intimidating ethnic Armenians in the vicinity of Azerbaijan's armed forces; disrupting the supply of public utilities to Armenian households; and blocking mobile communication and internet access in areas inhabited by ethnic Armenians.

**Defendant Vaziri Eyes the Spoils of War**

53.    Anglo Asian saw great opportunity in the spoils of the 44-Day War. DEFENDANT VAZIRI, as President and CEO of Anglo Asian, stated that the outcome of the 44-Day War

"presented an opportunity for Anglo Asian to develop its remaining contract areas, granted in 1998, and to significantly accelerate its growth strategy towards becoming a midtier gold and copper producer."

54.    Within 5 weeks of the signing of the Trilateral Statement, Anglo-Asian appointed Michael Sununu (the son of John H. Sununu and the brother of the *current* New Hampshire Governor, Christopher Sununu) to Anglo Asian's board of directors.

55.    On January 21, 2021, Anglo Asian announced that it "welcome[d] the agreement between Armenia, Azerbaijan, and Russia which has ended the military conflict over the enclave of Nagorno Karabakh. [Anglo Asian] is pleased to provide an update on its three restored contract areas located in the formerly occupied territories and Nagorno Karabakh."

56.    These three purported contract areas included the Sotk (Soutely) mine and the Drmbon (Kyzlbulag) mine. However, a significant portion of the Sotk (Soutely) mine remained in the sovereign territory of the Republic of Armenia, and the Drmbon (Kyzlbulag) mine remained entirely in Nagorno-Karabakh, where Russian peacekeepers were now deployed.

57.    Anglo Asian was confident that it would obtain access to the mines located in Nagorno-Karabakh, announcing in May 2021: "Our access to the region will be coordinated by the Government of Azerbaijan in conjunction with the Russian peacekeepers."

58.    That said, throughout 2021, Azerbaijan was not able to "coordinate" access to the Nagorno-Karabakh mine "in conjunction with the Russian peacekeepers" or to the Sotk (Soutely) mine.

59.    DEFENDANT VAZIRI engaged in meetings with President Aliyev and/or other government representatives of Azerbaijan regarding access to these mines and, in the fall of 2021, announced that Anglo Asian had been "awarded three new concession areas bordering the

Gedabek and Kyzlbulag contract areas." Anglo Asian noted further that "[d]eveloping these [three new concessions] is key to the company's growth strategy[.]" One of these purported new concession areas included the Kashen (Demirli) mine located completely within Nagorno-Karabakh.

60.     On November 11, 2021, Azerbaijan attacked the Republic of Armenia in the direction of the Sotk (Soutely) mine. The attacks failed to give Azerbaijan control over the whole of the Sotk (Soutely) mine. Azerbaijani efforts to gain control over, and provide Anglo Asian access to, the whole of the Sotk mine failed throughout the next several months.

61.     On July 5, 2022, Azerbaijan formally announced an amendment to the Production Sharing Agreement and, on July 6, 2022, Aliyev signed the amendment for the exploration, development, and distribution of "promising gold deposits" into law. In this amendment, Azerbaijan granted to Anglo Asian Mining PLC three purported additional contract areas located wholly within Nagorno-Karabakh and relinquished the Sotk (Soutely) mine area, the mine toward which Azerbaijan launched its attack in November 2021.

62.     DEFENDANT VAZIRI later praised the amendment: "following extensive negotiations, we are very pleased to have secured two additional highly strategic mining properties immediately adjacent to the north of Gedabek contract area. Together with the new Demirli [Kashen] mining property, they ensure the Company is now in an excellent position to generate long-term sustainable growth with a greatly increased resource and reserve base with outstanding exploration potential."

63.     On July 14, 2022, media began to report an impending copper shortage, stating that "demand for copper is booming, but supply can't keep up." A report stated that "unless significant

new supply becomes available, climate goals will be short circuited and remain out of reach." Both the Kashen (Demirli) and Drmbon (Kyzlbulag) mines contain copper deposits.

64.    Anglo Asian explained to its investors that "Russian peacekeepers are currently present in the area [Nagorno-Karabakh] ensuring the region is safe. The [Azerbaijan] Government will use all its reasonable endeavors to ensure that the Company has physical access to the region to undertake mineral exploitation."

### Refused Access and the Blockade

65.    On or about the end of 2022, DEFENDANT VAZIRI pressed Azerbaijan for access to the Kashen (Demirli) and/or Drmbon (Kyzlbulag) mines in Nagorno-Karabakh (hereinafter, collectively, the "NK Mines").

66.    On December 3, 2022, a group of Azerbaijanis physically blocked the Goris-Stepanakert Highway near Shushi for several hours demanding that Artsakh halt the mining activities at the Kashen (Demirli) mine and give them access to the mine.

67.    DEFENDANT VAZIRI continued pressing Azerbaijan for access to the NK Mines. On December 10, 2022, Azerbaijan sent a letter to the Russian Peacekeepers demanding access for an observation group, comprised in part by Anglo Asian agents, to one or more of the NK Mines.

68.    However, the Azerbaijan/Anglo Asian observation group's visit was not agreed upon by the government of the Artsakh Republic. Instead, the Artsakh Government offered access to Azerbaijani environmental experts *only together with international experts*. Azerbaijan refused international experts or observers.

69.    The Azerbaijan/Anglo Asian observation group attempted entry to the area of one or more of the NK Mines regardless, which attempt was prevented by employees of the mining company operating the mine and the adjacent community residents.

70.    At around 10:30 a.m. on December 12, 2022, a large group of Azerbaijanis physically blocked the Goris-Stepanakert Highway near Shushi, entirely preventing the passage of all vehicles through the Lachin Corridor. These individuals presented themselves as "eco-activists", but investigations have not revealed that any of them have had a meaningful record of environmental activism. Indeed, one of Azerbaijan's (actual) leading environmental activists noted that "[t]hese [eco-activists] are just executives of a custom-tailored spectacle."

71.    The "eco-activists" claimed that authorities of Nagorno-Karabakh were "illegally exploiting gold and cooper molybdenum deposits and using the Lachin road to transport those minerals to Armenia." They demanded access to mining sites under the control of Nagorno-Karabakh, namely the Kashen (Demirli) and the Drmbon (Kyzlbulag) mines.

72.    On December 20, 2022, DEFENDANT VAZIRI caused Anglo Asian to write to senior representatives of a number of international organizations and governments, including the United Nations, the U.S. State Department, the U.K. Foreign Office and the European Union about the activities of Anglo Asian and their purported rights "to exploit minerals currently being exploited by others."

73.    In their petition to these international bodies and foreign state entities, Anglo Asian stated that it is "requesting support from these authorities for the restoration of its legitimate business rights and the safe physical access for Anglo Asian's employes to the [Drmbon] Kyzlbulag and [Kashen] Demirli mines and surrounding exploration territory in Karabakh." The

Anglo Asian petition instructed those seeking further information to contact DEFENDANT VAZIRI directly.

74.     On January 17, 2023, Azerbaijan demanded that the Artsakh government relinquish control over the Drmbon (Kyzlbulag) mine in exchange for opening the Lachin Corridor. The Artsakh Government rejected this demand.

75.     On February 22, 2023, the International Court of Justice ("ICJ") issued an order indicating interim measures against Azerbaijan stating, in no uncertain terms, that "The Republic of Azerbaijan shall, pending the final decision in the case and in accordance with its obligations under the International Convention on the Elimination of All Forms of Racial Discrimination, take all measures at its disposal to ensure unimpeded movement of persons, vehicles and cargo along the Lachin Corridor in both directions." Azerbaijan has failed to comply with the ICJ Order.

76.     On March 1, 2023, representatives of the governments of Artsakh and Azerbaijan met at the headquarters of the Russian peacekeepers in Nagorno-Karabakh. During the talks, Azerbaijan's representatives again demanded access to one or both of the NK Mines in exchange for ending the blockade of Artsakh. The Artsakh government rejected the demand and demanded that the blockade of the Lachin Corridor be lifted by Azerbaijan, pursuant to the Trilateral Statement and the ICJ Order.

77.     On March 5, 2023, Azerbaijani armed forces illegally crossed the ceasefire line, entered a civilian road inside Nagorno-Karabakh, and attacked a vehicle carrying Artsakh civilian police officers, killing three and wounding one. Azerbaijani armed forces shot one of the Artsakh civilian police officers 28 times.

78.     On March 6, 2023, Ilham Aliyev again threatened Nagorno-Karabakh, stating that unless the Artsakh Armenians complied with his demands, the situation would grow worse.

79.    Azerbaijan's blockade of the Lachin Corridor (the "Blockade") continues as of the date of this filing, now for seven months, leaving the Artsakh Armenians surrounded completely by Azerbaijani armed forces and without any access to Armenia or the outside world.

80.    As stated by the Council of Europe's Rapporteur for Lachin Corridor Crisis, Mr. Paul Gavan, in his recent remarks to the Parliamentary Assembly of the Council of Europe regarding this crisis: "[T]he lack of access [in and out of the Lachin Corridor] has been the case since the 12th of December last when a group of so-called eco-activists set up a blockade on the Lachin Corridor apparently making claims of illegal mining." Rapporteur Gavan continued:

> Colleagues, the key finding of my report is that here is neither free nor safe access through the Lachin Corridor—and, indeed, this [finding] is in line with the judgment of the International Court of Justice and, indeed, the interim measures from our own Court here in Strasburg.
>
> . . .
>
> [T]here is a growing humanitarian crisis in Nagorno-Karabakh, and ***the current situation is simply not sustainable for the local population.*** The crisis manifests itself in many ways: enforced family separation, enforced isolation of an entire community, and the fear and panic that that engenders. Access to food, access to medicines, access to medical care, access to education. Schools were closed for months during the winter because of the inability to heat them, and this was due to the deliberate cutting off of electricity and gas to the region. Electricity cut off since the 9th of January. Gas cut off on several occasions and then indefinitely since the 21st of March. So, the only means of travel was for people who were sick and that was through the ICRC, but that has been completely shut down now.
>
> So, I want you to take a moment to imagine the situation that community finds itself in. Cut off and, to their minds, forgotten by the international community.
>
> And then there is the hate speech, which comes from the very highest levels of the Azerbaijan government. President Aliyev himself has referred to the population of Nagorno-Karabakh as the "contemptible, loathsome and hated enemy". He also made a speech

in Lachin itself just a couple of weeks ago and he sent this message to his Armenian neighbours. He said, "let them know that we can see Armenian villages from here. We can see those villages, so they should not forget about that." And one further example, the foreign affairs committee in the Azerbaijan Parliament actually referred to the Armenian diaspora as a "cancer on the body politic of Europe". Colleagues, please, I hope we can all agree that this language is entirely unacceptable.

So, my report makes a number of key recommendations. We should open the Lachin Corridor and we need to see it open and we need all parties to abide by the trilateral agreement. Crucially, we need a fact-finding mission to Nagorno-Karabakh. This is really the elephant in the room, and it is a particularly large elephant. ***No one, I cannot get access through Lachin, but neither can our Human Rights Commissioner, neither can the UNHCR, neither can UNESCO. I have to ask the question: What is it that Azerbaijan are afraid that we will see?***

. . .

Colleagues, to conclude, the current situation is simply not sustainable. There's actually been no access to food or medicines or anything for over a week now. We know the Corridor is blocked. I'm saying that having done as much thorough research as I can and without being able to access the Lachin Corridor because that was denied.

As we head towards the winter, they are expecting more power cuts. They are literally running out of the ability to produce any energy, because the hydroelectric dam they have is now running out of water. The situation is not sustainable. A human rights crisis is developing and continues to worsen.

. . .

I regret I have [] an urgent update that I have received just in the last 20 minutes from the EU Monitoring Commission at the Lachin Corridor, and they've confirmed that ***this afternoon Azerbaijan have installed concrete blocks, obstacles of approximately knee height, across both lines of the road so it is not possible to pass on the road by vehicle***. They installed them behind the permanent Azerbaijan checkpoint, the green tent. On a day when we are debating this issue, to hear that news is frankly incredibly depressing.

. . .

The humanitarian crisis that we are facing, I believe, is extremely serious. People have not been able to access any food or supplies over the last week. There are massive issues, as have been pointed out by speakers, in terms of health and welfare for children, they're facing into prolonged power cuts, they're facing into a winter that frankly I can't see how they can manage.

## CLASS ACTION ALLEGATIONS

81.    Plaintiff brings this action in counts 1 through 3 pursuant to Fed. R. Civ. P. 23(a) on behalf of herself and a class of similarly situated individuals ("Class"), defined as follows:

All persons located in that part of Nagorno-Karabakh which is currently surrounded by Azerbaijani armed forces and/or other agents of the Azerbaijani regime (hereinafter "NK Confinement Area") from December 12, 2022, to the present.

Excluded from the Class are: (1) Defendant, Defendant's agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendant or any entities in which Defendant has a controlling interest, and those entities' current and former employees, officers, and directors; (2) the Judge to whom this case is assigned and the Judge's immediate family; (3) any person who executes and files a timely request for exclusion from the Class; (4) any persons who have had their claims in this matter finally adjudicated and/or otherwise released; (5) any person serving in the Artsakh Defense Forces, Russian Peacekeeping Units or Azerbaijani Armed Forces; (6) the legal representatives, successors and assigns of any such excluded person.

82.    **Numerosity**: The exact number of Class members is unknown and is not available to Plaintiff at this time, but individual joinder in this case is impracticable. The Class is likely to consist of approximately 120,000 individuals currently blockaded in Nagorno-Karabakh.

83.    **Commonality and Predominance**: There are several questions of law and fact common to the claims of Plaintiff and the Class members, and those questions predominate over any questions that may affect individual class members. The common questions of law and fact

for Plaintiff and all Class members include, but are not limited to, whether Defendant's conduct in aiding and abetting the blockade of Artsakh Armenians by Azerbaijan constitutes (a) aiding and abetting false imprisonment; (b) aiding and abetting intentional infliction of emotional distress; and (c) aiding and abetting a violation of the Torture Victims Protection Act. The common questions of law and fact predominate over the variations that may exist between members of the Class, if any. Plaintiff and the members of the Class, as well as DEFENDANT VAZIRI, have a commonality of interest in the subject matter and the remedy sought.

84.    **Adequacy of Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and she has retained counsel competent and experienced in complex class action litigation. Plaintiff has no interest antagonistic to those of the Class, and DEFENDANT VAZIRI has no defenses unique to Plaintiff.

85.    **Appropriateness**: Class proceedings are also superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. Further, it would be virtually impossible for the individual members of the Class to obtain effective relief because the burden and cost of individually conducting the complex litigation necessitated by DEFENDANT VAZIRI's actions would be too great for the individual members of the Class.  Even if Class members were able or willing to pursue such individual litigation, a class action would still be preferable because a multiplicity of individual actions would likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Class Action Complaint. A class action, on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single Court, and would result in reduced time, effort and expense for all parties and the Court, and ultimately, the uniformity of decisions. Accordingly, a class action is an

appropriate method for the fair and efficient adjudication of this lawsuit and distribution of the common fund to which the Class is entitled.

## COUNT 1

## AIDING AND ABETTING

## FALSE IMPRISONMENT

86.     Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 85.

87.     Beginning on December 12, 2022, Azerbaijan unlawfully instituted the Blockade and thereby restrained Plaintiff and the putative class's physical liberty and freedom of movement against her/its will and without her/its consent, confining Plaintiff and the putative class to the NK Confinement Area without the ability of egress from that confined area.

88.     Azerbaijan unlawfully restrained Plaintiff and the putative class's physical liberty and freedom of movement and confined Plaintiff and the putative class to the NK Confinement Area by force, the threat of force, and the threat of violence and/or physical harm.

89.     Azerbaijan unlawfully restrained Plaintiff and the putative class's freedom of movement and confined Plaintiff and the putative class to the NK Confinement Area using physical barriers, terror, misinformation and propaganda.

90.     In fact, due to Azerbaijan's unlawful restraining of freedom of movement, Plaintiff and the putative class have nowhere to go in the event of an attack. There is no egress to a place of safety; Plaintiff and the putative class cannot leave the NK Confinement Area and are imprisoned.

91.     Because of the unlawful restraint of Plaintiff and the putative class, who are also under the threat of violence due to the Azerbaijani military threat and Azerbaijani military posts directed at the NK Confinement Area's borders and villages, Plaintiff and the putative class are

compounded by fear of attack while being imprisoned by Azerbaijan, without egress to safety, which has caused Plaintiff and the putative class to have a persistent fear of terror, harm, violence and death resulting in severe psychological trauma.

92.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and the putative class's physical liberty and freedom of movement by collaborating with Azerbaijan in devising, organizing, planning, funding and/or executing the "eco-protest" blocking the Lachin Corridor.

93.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and the putative class's physical liberty and freedom of movement by suggesting, advising, and/or insisting that the Blockade serve as a mechanism by which to obtain access to the NK Mines.

94.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and the putative class's physical liberty and freedom of movement by suggesting, advising, and/or insisting that the Blockade be maintained, and not be lifted, unless and until DEFENDANT VAZIRI, his agents and/or his collaborators are granted access to the NK Mines.

95.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and the putative class's physical liberty and freedom of movement by lobbying foreign governments and international institutions to justify, whitewash, and/or divert attention away from the Blockade until DEFENDANT VAZIRI, his agents and/or his collaborators were granted access to the NK Mines.

96.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and the putative class's physical liberty and freedom of movement

by lobbing foreign governments and international institutions to promote the narrative that he and/or his entities had a right to the NK Mines.

97.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's unlawful restraint on Plaintiff and putative class's physical liberty and freedom of movement by causing access to the NK Mines to be a material demand of Azerbaijan in their negotiations with Artsakh in exchange for lifting the Blockade.

98.     As a result of Azerbaijan's conduct, aided and abetted by DEFENDANT VAZIRI, Plaintiff and the putative class's physical liberty and freedom of movement has been restrained against her/its will and without her/its consent, confining Plaintiff and the putative class to the NK Confinement Area without the ability of egress from that confined area.

99.     DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan's Blockade despite his knowledge that the Blockade would amount to an unlawful restraint on the physical liberty and freedom of movement of Plaintiff and the putative class.

100.    DEFENDANT VAZIRI undertook these acts of substantial encouragement and assistance with malice and/or reckless disregard for the unlawful restraint on the physical liberty and freedom of movement of Plaintiff and the putative class.

101.    In fact, DEFENDANT VAZIRI undertook the enumerate acts of substantial encouragement and assistance of Azerbaijan willfully to restrain Plaintiff and the putative class's physical liberty and freedom of movement to force the government of Artsakh to succumb to demands to grant access to the NK mines.

102.    DEFENDANT VAZIRI's conduct is outrageous and extreme in character and degree and goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

WHEREFORE, Plaintiff GAYANE LALABEKYAN respectfully requests on her behalf and behalf of the putative class that this Honorable Court grant Plaintiff relief in her favor and against DEFENDANT MOHAMMAD REZA VAZIRI for (a) compensatory damages in an amount to be proven at trial; (b) punitive damages in an amount to be proven at trial; (c) attorneys' fees in an amount to be proven at trial; (d) costs of suit; and (e) any and all other relief which this Honorable Court finds just and proper.

## COUNT 2
## AIDING AND ABETTING
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

103.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 102.

104.    Beginning on December 12, 2022, Azerbaijan unlawfully instituted the Blockade of Nagorno-Karabakh and, in doing so, confined Plaintiff and the putative class to the NK Confinement Area without the ability of egress.

105.    By intentionally and deliberately instituting the Blockade, Azerbaijan blocked and prevented the normal delivery of food to Plaintiff and the putative class, besieged in the NK Confinement Area.

106.    Plaintiff and the putative class suffer periods of time where there is no or little food available due to the lack of ingress/egress to Artsakh for food deliveries. Accordingly, Plaintiff and the putative class, including pregnant women and children, are unable to satisfy their human dietary needs and have suffered physical ailments associated with malnutrition and/or undernutrition due to the food shortage caused by the Blockade.

107.    In addition, due to the lack of food, Plaintiff and the putative class are unable to maintain concentration at work, school or their daily tasks.  Plaintiff and the putative class are

preoccupied by having to search for food and stocking up on the same, if any is found. School has been interrupted due to the lack of food, as children and adults are sent scouring for available food, including standing in lines for food rations. Food is not routinely available at food stores where store shelves are bare from lack of supply.

108.    By intentionally and deliberately instituting the Blockade, Azerbaijan also has blocked and prevented the normal delivery of medicines and hygiene products to Plaintiff and the putative class, besieged in the NK Confinement Area.

109.    Plaintiff and the putative class are unable to access or find resources for medicines needed for routine and dire circumstances, including medicines like insulin and lifesaving dialysis, causing a decrease in their health and well-being. Plaintiff and the putative class search pharmacies, neighbor's homes and their communities for medicines. Plaintiff and the putative class walk to distant villages to seek medicines, including routine medications, urgent care items, and simple first aid for themselves and their families, often to find none.

110.    Similarly, Plaintiff and the putative class are unable to access baby formula, diapers and any other items needed for newborn babies. Medicines, baby food, diapers and formula cannot be ordered for delivery, and outside resources cannot be accessed as there is no ingress and egress to and from the NK Confinement Area due to the Blockade.

111.    Plaintiff and the putative class fear illness, injury and hospitalization because of the lack of materials and medicines needed for treatment and surgeries, including childbirth. Doctors and hospitals are largely unable to help or treat patients for their ailments because of the lack of medicines and medical supplies.

112.    Azerbaijan also has interrupted gas and electricity supplies to the NK Confinement Area depriving Plaintiff and the putative class, who were trapped in the NK Confinement Area in the dead of winter, of heating gas, light, and communications with the outside world.

113.    Because of the interrupted gas and electricity, Plaintiff and the putative class are exposed to extreme hot and cold conditions, based on weather changes.  In addition, due to long periods of no access to gas, Plaintiff and the putative class are unable to heat their water for bathing and cleaning causing a hygiene and health crisis. They are unable to cook any food if they only have access to a gas stove. Furthermore, because of the lack of gasoline, the buses and cars are unable to function, effectively cutting off families from each other and preventing access to other places within the NK Confinement Area for school, work and other activities.

114.    Due to infrequent gas and electricity, Plaintiff and the putative class have also had to change their schedules including school, which often cannot be held due to temperatures and lack of electricity in school buildings.

115.    Plaintiff and the putative class live in persistent fear of a lack of basic resources like food, hot water, medicines, gas and electricity.

116.    Plaintiff and the putative class are suffering from psychological effects of the Blockade, including prolonged fear, stress, and feelings of hopelessness, causing an inability to engage in otherwise normal activities and work.  These effects are not just felt by adults but also by Artsakh children who physically and psychologically sense the gravity imposed by the lack of food, resources, electricity, and medicine.

117.    At the same time, Azerbaijan also carries out military operations inside the territory of the NK Confinement Area, spreads misinformation to the population of the NK Confinement

Area, and threatens physical violence and assault to terrorize Plaintiff and the putative class, besieged in the NK Confinement Area.

118.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan in conducted the Blockade by collaborating with Azerbaijan in devising, organizing, planning, funding and/or executing the Blockade.

119.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan in conducted the Blockade by suggesting, advising, and/or insisting that the Blockade serve as a mechanism by which to obtain access to the NK Mines.

120.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by suggesting, advising, and/or insisting that the Blockade be maintained, and not be lifted, unless and until DEFENDANT VAZIRI, his agents and/or his collaborators are granted access to the NK Mines.

121.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by lobbing foreign governments and international institutions to justify, whitewash, and/or divert attention away from the Blockade until DEFENDANT VAZIRI, his agents and/or his collaborators were granted access to the NK Mines.

122.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by lobbing foreign governments and international institutions to promote the narrative that he and/or his entities had a right to the NK Mines.

123.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by causing access to the NK Mines to be a material demand of Azerbaijan in their negotiations with the government of Artsakh in exchange for lifting the Blockade.

124.    As a result of Azerbaijan's conduct, aided and abetted by DEFENDANT VAZIRI, Plaintiff and the putative class has been intentionally and deliberately subjected to extreme, inhumane and unreasonable suffering and hardship including (a) ongoing malnutrition and/or undernutrition due to inadequate food; (b) exposure to extreme temperatures for prolonged periods of time without access to heating sources; (c) ongoing pain and suffering due to inaccessibility of routine medicines, hygiene products, and medical supplies; (d) persistent fear and terror of physical harm, violence and death due to military attacks, terror and misinformation campaigns while physically besieged and isolated from the outside world; and (e) severe psychological trauma caused by physical isolation, terror, and persistent uncertainty as to the prospect of human survival amidst dwindling food supplies, depleting medicines, and prolonged and increasingly austere living conditions under constant threat of physical violence.

125.    DEFENDANT VAZIRI undertook the enumerated acts of substantial encouragement and assistance of Azerbaijan intentionally and with reckless disregard for the pain and suffering the Blockade would cause to Plaintiff and the putative class.

126.    In fact, DEFENDANT VAZIRI undertook the enumerate acts of substantial encouragement and assistance of Azerbaijan willfully to cause Plaintiff and the putative class unbearable pain and suffering to force the government of Artsakh to succumb to demands to grant access to the NK mines.

127.    DEFENDANT VAZIRI's conduct is outrageous and extreme in character and degree and goes beyond all possible bounds of decency so as to be regarded as atrocious and utterly intolerable in civilized society.

WHEREFORE, Plaintiff GAYANE LALABEKYAN respectfully requests on her behalf and behalf of the putative class that this Honorable Court grant Plaintiff relief in her favor and

against DEFENDANT MOHAMMAD REZA VAZIRI for (a) compensatory damages in an amount to be proven at trial; (b) punitive damages in an amount to be proven at trial; (c) attorneys' fees in an amount to be proven at trial; (d) costs of suit; and (e) any and all other relief which this Honorable Court finds just and proper.

**COUNT 3**

**AIDING AND ABETTING**

**VIOLATION OF THE TORTURE VICTIM PROTECTION ACT**

128.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 127.

129.    Beginning on December 12, 2022, Azerbaijan unlawfully instituted the Blockade and, in doing so, confined Plaintiff and the putative class to the NK Confinement Area, blocked Plaintiff and the putative class's ability of egress, and completely surrounded the NK Confinement Area thereby isolating it and preventing Plaintiff and the putative class from accessing any outside physical contact.

130.    Beginning on December 12, 2022, Azerbaijan unlawfully instituted the Blockade and, in doing so, confined Plaintiff and the putative class to the NK Confinement Area without the ability of egress. This is a violation of the international law which guarantees human beings the freedom of movement, the right to ingress and egress from one's own country, including the right to leave one's country and to return to one's country.

131.    By intentionally and deliberately instituting the Blockade, Azerbaijan blocked and prevented the normal delivery of essential food to Plaintiff and the putative class, besieged in NK Confinement Area. The imposition of measures calculated to starve civilian human beings is against international law and a violation of international humanitarian law.

132.    By intentionally and deliberately instituting the Blockade, Azerbaijan blocked and prevented the normal delivery of essential medicines and hygiene products to Plaintiff and the putative class, besieged in the NK Confinement Area. The imposition of measures calculated to deprive civilian human beings of access to medicine and hygiene products is against international law and a violation of international humanitarian law.

133.    Azerbaijan also interrupted gas and electricity supplies to the NK Confinement Area depriving Plaintiff and the putative class, besieged in the NK Confinement Area in the dead of winter, of heating gas, light, and communications with the outside world. The imposition of measures calculated to impose inhumane and brutal living conditions on civilian human beings is against international law and a violation of international humanitarian law.

134.    Azerbaijan carries out military attacks inside the territory of the NK Confinement Area, spreads misinformation to the population of the NK Confinement Area, and threatens physical violence and assault in order to terrorize Plaintiff and the putative class, besieged in Blockaded Artsakh (Nagorno-Karabakh). The imposition of measures calculated to use of force or the threat of force on civilian human beings is against international law and a violation of international humanitarian law.

135.    Azerbaijan has imposed the Blockade as a means of state terrorism, political repression and exploitation, racial discrimination and with the intent to ultimately exterminate, deport, and/or forcibly remove Plaintiff and the putative class from Nagorno-Karabakh and/or to make living conditions for the Artsakh Armenians so severe and austere as to coerce Plaintiff and the members of the putative class to leave Nagorno-Karabakh and to not return. These actions are crimes against humanity and a violation of international law.

136.    The Lemkin Institute for Genocide Prevention has issued an alert stating that Azerbaijan's conduct is part of a larger genocidal pattern, demonstrating Azerbaijan's Armenophobia and genocidal intent aimed at the eradication of Armenia, Artsakh, and the Armenians. Other international watchdogs including Genocide Watch and the International Association of Genocide Scholars have issued similar warnings.

137.    Due to the Blockade, Plaintiff and the putative class live in a persistent fear of terror, harm, violence and death. Plaintiff and the putative class suffer psychological trauma due to the threats of terror, harm, violence and death; the lack of ingress/egress from their country; and their inability to obtain food, gas, electricity and medicines.  Plaintiff and the putative class live their days constantly occupied by the situation, suffering headaches, anxiety, and severe stress. Plaintiff and the putative class also suffer the psychological effects of observing and experiencing their own malnutrition and medical circumstances—as well as those of their children, friends, neighbors, coworkers and their communities—worsen day to day while the Blockade continues.

138.    Due to the Blockade and Azerbaijan's terror and misinformation campaigns, Plaintiff and the putative class hold the strong belief that, if Azerbaijan attacks or occupies their villages, they will be brutalized and/or killed just as they have seen on internet postings and news circulated by Azerbaijan and Azerbaijanis.

139.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan in conducted the Blockade by collaborating with Azerbaijan in devising, organizing, planning, funding and/or executing the Blockade.

140.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan in conducted the Blockade by suggesting, advising, and/or insisting that the Blockade serve as a mechanism by which to obtain access to the NK Mines.

141.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by suggesting, advising, and/or insisting that the Blockade be maintained, and not be lifted, unless and until DEFENDANT VAZIRI, his agents and/or his collaborators are granted access to the NK Mines.

142.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by lobbing foreign governments and international institutions to justify, whitewash, and/or divert attention away from the Blockade until DEFENDANT VAZIRI, his agents and/or collaborators were granted access to the NK Mines.

143.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by lobbing foreign governments and international institutions to promote the narrative that he and/or his entities had the right to the NK Mines.

144.    DEFENDANT VAZIRI substantially encouraged and assisted Azerbaijan by causing access to the NK Mines to be a material demand of Azerbaijan in their negotiations with the Artsakh Government in exchange for lifting the Blockade.

145.    As a result of Azerbaijan's conduct, aided and abetted by DEFENDANT VAZIRI, Plaintiff and the putative class has been intentionally and deliberately subjected to extreme, inhumane and unreasonable suffering and hardship including: (a) ongoing malnutrition and/or undernutrition due to inadequate food; (b) exposure to extreme temperatures for prolonged periods of time without access to heating sources; (c) ongoing pain and suffering due to inaccessibility of routine medicines, hygiene products, and medical supplies; (d) persistent fear and terror of physical harm, violence and death due to military attacks, terror and misinformation campaigns while physically besieged and isolated from the outside world; and (e) severe psychological trauma caused by physical isolation, terror, and persistent uncertainty as to the prospect of human survival

amidst dwindling food supplies, depleting medicines, and prolonged and increasingly austere living conditions under constant threat of physical violence.

146.    The Blockade is so severe, extreme and outrageous that it has warranted, and received, the universal condemnation of the international community, including the United States, the United Nations, the European Union, France, as well as the European Court of Human Rights and the International Court of Justice, the last of which has ordered Azerbaijan to immediately end the Blockade of Nagorno-Karabakh.

147.    Azerbaijan's conduct amounts to actionable torture under the Torture Victims Protection Act.

148.    DEFENDANT VAZIRI undertook the enumerated acts of substantial encouragement and assistance of Azerbaijan intentionally and with reckless disregard for the pain and suffering the Blockade would cause Plaintiff and the putative class.

149.    In fact, DEFENDANT VAZIRI undertook the enumerate acts of substantial encouragement and assistance of Azerbaijan willfully to cause Plaintiff and the putative class unbearable pain and suffering in order to force the government of Artsakh to succumb and grant access to the NK mines.

150.    DEFENDANT VAZIRI's conduct is outrageous and extreme in character and degree and goes beyond all possible bounds of decency, so as to be regarded as atrocious and utterly intolerable in civilized society, extremely cruel and inhumane in nature, specifically intended to inflict excruciating and agonizing physical and/or mental pain and suffering.

151.    Azerbaijan and DEFENDANT VAZIRI's conduct constitute deliberate and calculated acts of intimidation and coercion in order to obtain from the government of Artsakh

certain concessions including access for DEFENDANT VAZIRI and/or his agents or collaborators to the NK Mines.

152.    The Blockade has lasted for seven months, and the supplies of food, medicines, and others essential goods have dwindled and threaten the physical survival of Plaintiff and the putative class.

153.    Remedies are not available in the jurisdiction where the torture has occurred, as the courts of the Republic of Artsakh are blockaded by Azerbaijan, aided and abetted by DEFENDANT VAZIRI, and, as such, do not have the means by which to serve summons outside of the NK Confinement Area.

154.    Remedies are neither available nor adequate in Azerbaijan. It is unclear whether the courts of Azerbaijan have any personal jurisdiction over the Defendant. However, and regardless, those courts are neither independent nor are they accessible by Plaintiff. Moreover, the Azerbaijani courts are subject to political influence and hampered by corruption. Furthermore, given the facts of this case—including the direct involvement of Azerbaijan in maintaining the Blockade despite and in clear violation of the order of International Court of Justice and despite the condemning statements of the United States, the United Nations, the European Parliament, and others—any resort to Azerbaijani courts would be futile.

WHEREFORE, Plaintiff GAYANE LALABEKYAN respectfully requests on her behalf and behalf of the putative class that this Honorable Court grant Plaintiff relief in her favor and against DEFENDANT MOHAMMAD REZA VAZIRI for (a) compensatory damages in an amount to be proven at trial; (b) punitive damages in an amount to be proven at trial; (c) attorneys' fees in an amount to be proven at trial; (d) costs of suit; and (e) any and all other relief which this Honorable Court finds just and proper.

Dated:  July 11, 2023

GAYANE LALABEKYAN
*individually and on behalf of the putative class*

/s/ Karnig S. Kerkonian

Karnig S. Kerkonian (D.D.C. Bar No. IL0040)
Elizabeth M. Al-Dajani (D.D.C. Bar No. IL0039)
KERKONIAN DAJANI LLP
1555 Sherman Avenue, Suite 344
Evanston, Illinois 60201
Tel. (312) 416-6180 Fax (312) 604-7815
kkerkonian@kerkoniandajani.com
ealdajani@kerkoniandajani.com

*Attorneys for Plaintiff*